UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| GREGORY BURKE; TONY CRUZ; AARON FERNANDEZ; JOSEPH GILBERT; RASHFORD GRANT; WINSTON HAMILTON; ALPHONSO HART; MANUEL HENRIQUEZ; CHRISTOPHER LAMAR; OLIVER MARTINEZ; LEAMON MINCEY; LUIS SANATA PEREZ; ELIEZER RUIZ; REX SALMON; RAY SEEBARAN; and RUFUS THOMAS, individually and on behalf of all others similarly situated, | Civil Action No.: |
| | |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| HOME BOX OFFICE, INC. | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs GREGORY BURKE ("Burke"); TONY CRUZ ("Cruz"); AARON FERNANDEZ ("Fernandez"); JOSEPH GILBERT ("Gilbert"); RASHFORD GRANT ("Grant"); WINSTON HAMILTON ("Winston"); ALPHONSO HART ("Hart"); MANUEL HENRIQUEZ ("Henriquez"); CHRISTOPHER LAMAR ("Lamar"); OLIVER MARTINEZ ("Martinez"); LEAMON MINCEY ("Mincey"); LUIS SANATA PEREZ ("Perez"); ELIEZER RUIZ ("Ruiz"); REX SALMON ("Salmon"); RAY SEEBARAN; and RUFUS THOMAS ("Thomas") (collectively, "Named Plaintiffs"), on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), by and through their attorneys, VALLI KANE & VAGNINI LLP, bring this action for damages and other legal and equitable relief from Defendant HOME BOX OFFICE, INC. ("Defendant") for violations of the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. §§ 201 *et seq.*, and any other cause(s) of action that can be inferred from the facts set forth herein.

1.      This is a collective action brought under the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* against Defendant for its failure to pay overtime to Plaintiffs who were employed by Defendant as Parking Production Assistants ("PPAs"). Defendant employed PPAs to secure sets, lots, and streets throughout the New York metropolitan area (the "Production Sites"), in connection with Defendant's production of television shows, motion pictures, films, movies and other productions which utilize PPAs ("Productions").

2.      PPAs were required to keep the Production Sites clear of pedestrians and motorists by either placing cones or by parking company vehicles in order to block both foot and vehicle traffic. PPAs were also responsible for safeguarding production vehicles and equipment while they were on set.

3.      Plaintiffs were non-exempt employees who were paid a shift rate of pay and who do not receive proper overtime compensation of one and a half (1 ½) times their regularly hourly rate for all hours worked beyond forty (40) per workweek.

4.      Defendant's regular failure to pay Plaintiffs for all hours worked over forty (40) in a workweek violates the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and any other cause(s) of action that can be inferred from the facts set forth herein.

5.      Defendant violated these laws by engaging in a systematic scheme of altering Plaintiffs' paychecks in order to deprive them of their statutorily required overtime pay.

6.      Named Plaintiffs allege, on behalf of themselves and all others similarly situated who elect to opt into this action pursuant to the FLSA, that they are entitled to recover: (i) unpaid and incorrectly paid wages for hours worked above 40 in a workweek, as required by law; (ii) unpaid overtime; (iii) liquidated damages; (iv) attorney fees and costs pursuant to the FLSA; and further relief as this Court finds necessary and proper.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) under 29 U.S.C. §§ 201 *et seq*.

8.      Venue is proper in this Court pursuant to 29 U.S.C. §§ 201 *et seq*., because this judicial district lies within a state in which the unlawful employment practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), because Defendant maintains facilities, conducts business and resides in this district.

## THE PARTIES

9.      At all relevant times, each and every one of the following Plaintiffs was an "employee" within the meaning of the FLSA and was employed by Defendant within this judicial district:

a)    Plaintiff Burke
b)    Plaintiff Cruz
c)    Plaintiff Fernandez
d)    Plaintiff Gilbert
e)    Plaintiff Grant
f)     Plaintiff Hamilton
g)    Plaintiff Hart
h)    Plaintiff Henriquez
i)     Plaintiff Lamar
j)     Plaintiff Martinez
k)    Plaintiff Mincey
l)     Plaintiff Perez
m)   Plaintiff Ruiz
n)    Plaintiff Salmon
o)    Plaintiff Seebaran
p)    Plaintiff Thomas

10.     Upon information and belief, Defendant is organized under the laws of the state of Delaware and has its principal place of business in New York, New York.

11.     Defendant transacted and continues to transact business in New York by employing persons as PPAs and by filming television and movie productions within the state of New York.

12.     Defendant has at all relevant times been an "employer" covered by the FLSA and the NYLL.

13.     Upon information and belief, the amount of qualifying annual volume of business for Defendant exceeds $500,000.00 and thus subjects Defendant to the FLSA.

14.     Upon information and belief, Defendant is engaged in interstate commerce. This independently subjects Defendant to the FLSA.

15.     Defendant employed Plaintiffs as a joint employer and/or single integrated enterprise along with the production companies associated with each of the film and television productions on which Plaintiffs worked as PPAs.

## STATEMENT OF THE FACTS

### I.     Facts Pertaining to Plaintiffs' Employment

16.     Defendant's business consists of, among other things, producing films and television series.

17.     Development and production of a film or television series requires the coordinated efforts of numerous people, including writers, directors, actors, editors, camera crew, sound crew, lighting crew, producers, production coordinators (including parking production coordinators and the parking production supervisors who report to the coordinators), supervisors, accountants, paymasters, and the cornucopia of other jobs that are typically reflected on the credit reels included at the end of each film or television production.

4

18.     At or near the bottom of the "totem pole" are the PPAs, who report to Defendant's Parking Coordinators. PPAs are responsible for showing up in advance of filming on location or on set to secure the parking spaces required for all of the production vehicles and trailers. PPAs are also responsible for safeguarding production equipment (e.g. cameras, sound and lighting equipment) over the course of however many days it takes to complete the filming of each project.

19.     The nature of PPAs' work is that it is only available for relatively short durations at a time, during the days in which a production is "on location." However, they will typically be called back to work on sequels or subsequent seasons of a film or television series that is popular and/or profitable. Once filming of a project they are working on is completed, PPAs generally move on to the next production that is being filmed. As a practical matter, this means they are continually rotating from one production to the next, and tend to be employed by multiple productions, working to secure locations for one project while another is between shoots, or working on productions sequentially as they become available. This also means that PPAs tend to work for multiple employers over the course of any given period of time. During the relevant period, PPAs were generally employed on multiple productions, simultaneously and/or consecutively, for multiple employers, including Defendant.

20.     Plaintiffs' job duties were integral to Defendant's productions because without reserved parking spots and streets void of unauthorized vehicles, Defendant's production equipment would have nowhere to park and/or productions would be hindered due to unauthorized vehicles being parked on location.

21.     Defendant's productions could not have been completed without Plaintiffs and other PPAs to secure the locations and equipment necessary to produce Defendant's films and television series.

5

### a. Production of Film and Television Series

22.     Prior to the development of films or television series, writers generally pitch their concepts and/or scripts to Defendant. When Defendant identifies films or series it expects will be commercially successful, Defendant contracts with the writers to develop and produce the projects.

23.     Defendant creates its films and television content through the use of different production company entities associated with each of their particular film and television productions. Defendant generally creates its media content under the brand name or label of one or more production company entities, which typically have unique, creative and memorable entity names, over which Defendant exercises dominion and control.

24.     Defendant provides the financing and/or financial support necessary to ensure that its production companies are able to create its film and television productions.

25.     Plaintiffs were employed by Defendant as PPAs, through its own production company subsidiaries and/or through third party production companies over which it exercised dominion and control. Defendant employed Plaintiffs on a variety of different film and television productions, simultaneously and/or consecutively.

### b. Defendant's Control and Dominion over Plaintiffs' Employment

26.     Despite being assigned to perform work for numerous production companies owned or controlled by Defendant, the terms and conditions of Plaintiffs' employment did not change from one production to the next, even when the production companies associated with the films or television series Plaintiffs were working on were different. In other words, the terms and conditions of Plaintiffs' employment were the same at all of the production companies owned and/or controlled by Defendant.

27.     For example, before commencing employment in connection with each film or television production, Plaintiffs were required to execute "start form" documentation—a packet containing, among other documents, an I-9 form, W-4 form, non-disclosure agreement, and emergency contact form. Each production company issued the same packet to Plaintiffs prior to the commencement of their employment. All of the production companies' start form documentation contained forms which included Defendant's name, which was pre-printed on the form.

28.     Plaintiffs were required to use Defendant's identification badges while working on any of Defendant's production sets. No matter what production Plaintiffs were working on, the identification badges consistently displayed "HBO"—Defendant's unmistakable logo.

29.     Plaintiffs, in connection with their employment, were given clothing emblazoned with the "HBO" logo at the end or "wrap" of each production.

30.     Defendant employed Parking Coordinators who were responsible for overseeing the PPAs and the PPAs' supervisors. Defendant's Parking Coordinators were employed by Defendant and held themselves out as employed by Defendant. For example, one of Defendant's Parking Coordinators, Mr. Maurice Cabrera ("Mr. Cabrera") displayed on his "LinkedIn page" that he was a parking coordinator for "HBO."

31.     Defendant and its production companies list the same address on their corporate documentation—1100 Avenue of the Americas 6-18, New York, NY 10036

32.     Defendant and its production companies jointly issued Plaintiffs' paychecks from Defendant's address at 2500 Broadway #400, Santa Monica, CA 90404.

33.     Defendant used third party payroll companies to pay Plaintiffs and other PPAs. Defendant had these payroll companies list their own (the payroll companies') subsidiaries in the

"employer" section of the W-2 form, despite the fact that the PPAs were never employed by the payroll companies and that Defendant's contracts with the payroll companies provide that the payroll companies are not the actual employers of the persons being paid (*i.e.* the PPAs).

34.    Defendant provided the payroll company with all the necessary hiring and employment records for the Plaintiffs including, but not limited to: W-2 employment forms, W-4 employment forms, pay rate acknowledgement forms, wage verification forms, conflict of interest questionnaires, direct deposit forms, and employment verification forms. Defendant also provided the final pay information for each Plaintiff to the payroll company that issued paychecks to Plaintiffs on a weekly basis.

35.    Defendant deducts from its taxes the expenses associated with its production of the film and television productions for which it utilizes Plaintiffs as PPAs. Upon information and belief, these deductions include the expenses associated with Plaintiffs' wages.

36.    Upon information and belief, Defendant maintained Plaintiffs' employment records or compelled third-parties, over whom it exercises dominion and control, to do so.

37.    Upon information and belief, Defendant set the budget for each of its film and television productions, which delineated as part of the budget Plaintiffs' rate of pay.

38.    Upon information and belief, Defendant determined the manner and frequency of Plaintiffs' pay.

39.    Defendant employed and used its own location scouts to identify filming locations for the productions produced by Defendant's purportedly "independent" production companies.

40.    For example, a July 29, 2014 news article from the Poughkeepsie Journal specifically cites to "HBO scouts" and "HBO Staff" searching for a filming location for the television show *Girls*.

41.    Based upon the preceding paragraph, upon information and belief, the location scouts were employed by Defendant and not by the production company.

42.    The July 29, 2014 news article form the Poughkeepsie Journal also states that "HBO" brought its own actors to film for the production *Girls*.

43.    Defendant, via local police departments, restricted parking in the areas surrounding its production locations and issued parking restriction notices to the area residents which identified "HBO" as the party responsible for the filming.

44.    For example, on September 28, 2016, the Hastings-on-Hudson police department issued a parking restriction notice for Defendant expressly referencing "HBO" and its television show *Girls*, which stated: "Parking Restrictions in Hastings Downtown area for Tuesday, August 2nd, due to HBO filming the television series 'Girls.'" Similarly, on May 1, 2017, the Hastings-on-Hudson police department issued another parking restriction notice expressly referencing "HBO" and its television show *Divorce,* which stated: "On Monday, May 15, 2017, HBO will be in our village filming for an episode of Divorce. The following Parking restrictions / Road closures will be in effect."

45.    Defendant maintained and managed all labor relations with Plaintiffs and other PPAs.

46.    Defendant in its capacity as an employer, negotiates labor relations, with Communications Workers of America, Local 1101, the collective bargaining unit that represents PPAs, including Plaintiffs—.

47.    The National Labor Relation Board, case number 02-0RC-212029 lists Defendant as Plaintiffs' and other PPAs' employer.

48.     Defendant is a party to collective bargaining agreements with other unions whose members are employed on the same productions as Plaintiffs, including the Teamsters.

49.     Defendant settled the *Fermin*, *et al. v. Home Box Office Inc.*, *et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015) (the "Lawsuit") with Plaintiffs and other PPAs, obtaining releases on behalf of Broken Records, LLC, Half A Yogurt, LLC, Home Box Office, Inc. (the "HBO Defendants.") and numerous other unnamed production companies.

50.     Defendant was the sole signatory to the Lawsuit settlement agreement (the "Settlement Agreement") on behalf of the HBO Defendants and at the time the Settlement Agreement was executed, Defendant was no longer a party to the Lawsuit due to being voluntarily dismissed from the action.

51.     Even though dismissed, Defendant agreed in the Settlement Agreement that settlement consideration would be paid into a fund from which Plaintiffs would be compensated.

52.     Upon information and belief, Defendant agreed that settlement consideration would be paid because Defendant was obligated to accept financial responsibility for liability incurred in connection with the film and television productions created through its purportedly "independent" production companies. Upon information and belief, the reason why Defendant was required to indemnify the production companies was because those production companies were contractually required to follow Defendant's policies and procedures with respect to hiring and compensating Plaintiffs and other PPAs.

53.     Furthermore, in the Settlement Agreement Defendant agreed that 50% of the settlement consideration was "wages."

**c.  The Application Process**

54.     Defendant did not post job openings for vacant PPA positions.

55.    Instead, Defendant hired PPAs exclusively through its Parking Coordinators, without a formal hiring process.

56.    Plaintiffs were hired by Defendant's Parking Coordinators via word of mouth and referrals from PPAs already employed by Defendant.

57.    The informal hiring process was conducted via telephone or text message.

58.    Parking Coordinators had broad discretion on what PPAs to hire and to retain.

59.    Once hired by Defendant's Parking Coordinator, Plaintiffs were assigned to productions.

60.    Plaintiffs were assigned to productions by their Parking Coordinators primarily through text messages and secondarily through telephone calls.

61.    Once assigned to a production, the Parking Coordinator and/or their PPA Supervisors contacted Plaintiffs to assign them their weekly work schedule.

62.    If Plaintiffs were not contacted by the Parking Coordinator for production assignments/shifts to work, Plaintiffs contacted their Parking Coordinator and/or PPA Supervisors to request assignment.

63.    Parking Coordinators then decided whether to assign Plaintiffs to work shifts, if available, for a particular production.

64.    Once a PPA was hired by Defendant they were used for subsequent productions as Defendant rarely hired new (or replaced current) PPAs.

65.    Once a production ended, Plaintiffs were generally contacted by their Parking Coordinator for assignment on Defendant's next production.

66.     Many of the PPAs engaged by Defendant through their Parking Coordinators, had a long work history in the industry and had worked on several productions for Defendant prior to the lawsuits filed by PPAs regarding their wages.

**d.  Job Duties**

67.     As PPAs, Plaintiffs' job duties primarily consisted of using their personal vehicles to reserve parking spots and sometimes entire city blocks for Defendant's production vehicles and equipment.

68.     Plaintiffs were often required to remain in their vehicles at a reserved parking spot location for up to twenty-four to forty-eight hours at a time.

69.     PPAs generally worked twelve (12) hour shifts and were paid on a per shift basis.

70.     Plaintiffs were supervised by Parking Coordinators.

71.     Defendant also employed PPA Supervisors to assist Parking Coordinators in supervising PPAs.

72.     PPA Supervisors reported directly to Parking Coordinators and PPAs reported to both the PPA Supervisors and the Parking Coordinators.

73.     Parking Coordinators and PPA Supervisors reported to Defendant, and were employees of Defendant.

74.     Defendant, through its Parking Coordinators and/or PPA Supervisors, assigned Plaintiffs their work schedules.

75.     Defendant communicated the work schedules to Plaintiffs through the Parking Coordinators via telephone and/or text messaging.

## II.    Facts Pertaining to *Fermin*, *et al. v. Home Box Office Inc.*, *et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015)

76.    On October 8, 2015, a collective action—*Fermin*, *et al. v. Home Box Office Inc.*, *et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015)—was commenced against Defendant in the Southern District of New York asserting violations of the FLSA, analogous provisions of the New York Labor Law, and the Wage Theft Prevention Act.

77.    The Lawsuit alleged almost identical allegations to the ones herein—Defendant failed to properly compensate the plaintiffs with an overtime premium for all hours worked in excess of forty (40) hours per workweek in violation of the FLSA and the NYLL[1].

78.    The Lawsuit ultimately reached settlement and its term were submitted to the Court for final approval on August 11, 2017.

79.    The Settlement Agreement included a notice (attached hereto as Exhibit A) that was sent to Plaintiffs and other potential collective members, which stated that the accompanying claim form required full execution and submission to the requisite Claims Administrator on or before June 27, 2017.

80.    On September 1, 2017, the Court granted Final Approval of  Settlement & Class & Collective Actions.

81.    Plaintiffs submitted the appropriate claim form to the requisite Claims Administrator.

82.    Plaintiffs, however, failed to submit their claim forms to the requisite Claims Administrator by June 27, 2017.

---

[1]    NYLL claims were released as to all Plaintiffs in *Fermin*, *et al. v. Home Box Office Inc.*, *et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015) and therefore are not being brought in his action.

83.     Despite Named Plaintiffs' pleas, Defendant refused to calculate Plaintiffs into the settlement distribution.

84.     Defendant never distributed settlement funds to Plaintiffs for the release of their claims pursuant to the Settlement Agreement.

**III.     Facts Pertaining to Defendant's Willful Violations of the FLSA**

**a.  Defendant's Pay Scheme**

85.     Plaintiffs were all employed by Defendant as PPAs within the past three (3) years.

86.      As PPAs, Plaintiffs were responsible for keeping Production Sites clear of pedestrians and motorists and for safeguarding production equipment while on set.

87.     Plaintiffs were required by Defendant to sign blank wage verification forms or forego the opportunity to work on the production. Defendant later filled in the respective forms with information concerning Plaintiffs' purported wages and hours worked.

88.     At the end of each pay period, Plaintiffs' Parking Coordinator filled out Plaintiffs' Time Sheet and sign his name for submission to Defendant's accountant(s) without obtaining Plaintiffs' approval. Plaintiffs never had any say with respect to the hours submitted.

89.     Plaintiffs were typically paid $150.00 per twelve (12) hour shift and worked, on average, between approximately sixty (60) and one-hundred (100) hours per week, consisting of approximately five (5) to nine (9) shifts.

90.     Plaintiffs were required by Defendant to work at least four (4) hours in order to be paid for a six (6) hour "half-shift" rate of pay. Similarly, Plaintiffs were required to work at least eight (8) hours in order to be paid for a twelve (12) hour "full shift" rate of pay. If Plaintiffs failed to meet the abovementioned thresholds, they were not compensated by Defendant for hours worked below these threshold levels.

91.     Plaintiffs were paid weekly by check, but the check did not accurately reflect their hourly rate of pay, overtime rate of pay, or actual hours worked.

92.     Plaintiffs' paychecks did not reflect their actual rate of pay. Instead, when Plaintiffs worked a twelve (12) hour shift, their paychecks reported that they worked eight (8) hours at one fictional rate and an additional four (4) hours at another fictional rate, where these fictional rates were "backed into" by Defendant's accountants (down to the fourth decimal place) so that the hours reported on Plaintiffs' paychecks came out to exactly equal the $150.00 shift rate described above, supporting the fact that they were in fact paid a shift rate.

93.     Plaintiffs were required to work in excess of forty (40) hours per week without receiving proper overtime compensation.

94.     Defendant's methodology of "backing out" the hours worked on Plaintiffs' paycheck was done in order to meet pre-fixed weekly figures based wholly off of the number of shifts he worked per pay period.

95.     As a result, Plaintiffs' paycheck did not reflect the actual hours worked and they were effectively made to work "off the clock."

**b.  Facts Pertaining to Defendant's Failure to Pay Plaintiffs the Overtime Premium**

96.     Defendant informed Plaintiffs that they were to be paid on a flat shift-rate basis, Defendant never correctly compensated Plaintiffs by paying their statutorily required overtime pay. Rather, Defendant unilaterally reduced the number of reported hours worked by Plaintiffs and calculated a fictitious, hourly overtime rate which ultimately resulted in Plaintiffs receiving only the flat shift rate.

97.     As such, the reported hours worked on each of the paychecks were consistently less than what Plaintiffs actually worked during that pay period. Moreover, because the paychecks

provided by Defendant to Plaintiffs reported that they worked fewer hours than the hours actually worked, the wage statements provided to Plaintiffs and those similarly situated were false.

98.     Upon information and belief, Defendant obtained the assistance of accountants and/or employees to calculate the precise number of purported regular, overtime and double time hours reported on Plaintiffs' checks so that Plaintiffs' stated weekly gross earnings correspond to pre-determined totals budgeted and accounted for by Defendant.

99.     Defendant's methodology of "backing out" the hours to meet pre-determined weekly figures is unlawful, as it directly resulted in Plaintiffs being improperly paid for their total hours worked.

100.     In order to hide the fact that Plaintiffs were paid less than what is statutorily required, Defendant falsely and incorrectly stated the numbers of hours worked in payroll records and on Plaintiffs' paychecks. Defendant did not factor in the fact that Plaintiffs' shifts were twelve (12) hours in length when computing their hours worked per week. This was all done by Defendant as part of an effort to withhold from Plaintiffs their lawful compensation.

101.     In effect, Defendant were continuously "shaving off" hours that Plaintiffs worked each week, forcing Plaintiffs to work "off-the-clock."

102.     As a result, Plaintiffs were not paid for their actual total hours worked throughout the workweek.

103.     Upon information and belief, Plaintiffs were treated uniformly throughout their employment with Defendant at its various Production Sites.

104.     At all relevant times, Defendant controlled all terms and conditions of Plaintiffs' employment, including but not limited to their hours and rates of pay.

105.    Defendant was aware of its payroll practice and consciously disregarded the requirements of the FLSA.

106.    Defendant knowingly and willfully payed a shift-rate for hours worked over forty (40) rather than an hourly rate, which deprived them of statutorily mandated overtime.

107.    Defendant knowingly and willfully deprived Plaintiffs of the statutorily mandated minimum wage as illustrated above.

108.    This falsification of payroll records further evidences Defendant's knowing and willful violation of the law.

### FLSA COLLECTIVE ACTION ALLEGATIONS

109.    Named Plaintiffs seek to bring this suit as a collective action pursuant to 29 U.S.C. § 216(b) on their own behalf as well as those in the following collective:

> All persons employed by Defendant as Parking Production Assistants within the past three (3) years through the final date of disposition who were not paid overtime compensation of one and a half (1 ½) times their hourly rate for all hours worked in excess of forty (40) hours per workweek by Defendant and were refused a disbursement from the *Fermin, et al. v. Home Box Office Inc., et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015) settlement fund by Defendant for submitting a claim form to the Claims Administrator after June 27, 2017.

110.    At all relevant times, Named Plaintiffs are and have been similarly situated to all FLSA Collective members[2] because while employed by Defendant they performed similar tasks, were subject to the same laws and regulations, were paid in the same or similar manner, were paid the same or similar rates, were required to work in excess of forty (40) hours per work-week, were not paid overtime compensation of one and a half (1 ½) times their hourly rate for all hours worked in excess of forty (40) hours per workweek by Defendant, and were refused a disbursement by

---

[2]        Hereinafter, referred to as FLSA Plaintiffs.

Defendant from the *Fermin, et al. v. Home Box Office Inc*., *et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015) settlement fund for submitting a claim form to the Claims Administrator after June 27, 2017.

111.  Defendant is and has been aware of the requirement to pay Named Plaintiffs and the FLSA Plaintiffs at a rate of one-and-one-half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek, yet willfully chose not to.

112.  The FLSA Plaintiffs, under Named Plaintiffs' FLSA claim, are readily discernable and ascertainable. All FLSA Plaintiffs' contact information is readily available in Defendant's records. Notice of this collective action can be made as soon as the Court determines.

113.  The number of FLSA Plaintiffs in the collective are too numerous to join in a single action, necessitating collective recognition.

114.  All questions relating to Defendant's violation of the FLSA share the common factual basis with Named Plaintiffs. No claims under the FLSA relating to the failure to pay statutorily required overtime premiums are specific to Named Plaintiffs and the claims asserted by Named Plaintiffs are typical of those of members of the collective.

115.  Named Plaintiffs will fairly and adequately represent the interests of the collective and have no interests conflicting with the collective.

116.  A collective action is superior to all other methods and is necessary in order to fairly and completely litigate violations of the FLSA.

117.  Named Plaintiffs' attorneys are familiar and experienced with collective and class action litigation, as well as employment and labor law litigation.

118.  The public will benefit from the case being brought as a collective action because doing so will serve the interests of judicial economy by reducing a multitude of claims to a single

litigation. Prosecution of separate actions by individual FLSA Plaintiffs creates a risk for varying results based on identical fact patterns as well as disposition of the collective's interests without their knowledge or contribution.

119.    The questions of law and fact are nearly identical for all FLSA Plaintiffs and therefore proceeding as a collective action is ideal. Without judicial resolution of the claims asserted on behalf of the proposed collective, Defendant's continued violations of the FLSA will undoubtedly continue.

## CAUSE OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, Made by Named Plaintiffs on Behalf of All FLSA Plaintiffs**
**(Failure to Pay Overtime)**

120.    Named Plaintiffs and the FLSA Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

121.    Throughout the period covered by the applicable statute of limitations, Named Plaintiffs and the FLSA Plaintiffs were required to work and did in fact work in excess of forty (40) hours per workweek.

122.    Defendant knowingly failed to pay Named Plaintiffs and the FLSA Plaintiffs the statutorily required rate of one-and-one-half (1½) times their hourly rate for all hours worked in excess of forty (40) per workweek.

123.    Defendant's conduct was willful and lasted for the duration of the relevant time periods.

124.    Defendant's conduct was in violation of the Fair Labor Standards Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Named Plaintiffs, on behalf of himself and all FLSA Plaintiffs employed by Defendant, demand judgment against Defendant as follows:

A.      At the earliest possible time, Named Plaintiffs should be allowed to give notice of this collective action, or the Court should issue such notice, to all members of the purported collective, defined herein. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper overtime wages;

B.      Designation of Named Plaintiffs as representatives of the FLSA Collective and Named Plaintiffs' counsel as Collective Counsel;

C.      Equitable tolling of the FLSA statute of limitations as a result of Defendant's failure to post requisite notices under the FLSA;

D.      Certification of this action as a Collective action pursuant to 29 U.S.C. § 216 for the purposes of the claims brought on behalf of all proposed FLSA collective members under the FLSA;

E.      Demand a jury trial on these issues to determine liability and damages;

F.      Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

G.      A judgment declaring that the practices complained of herein are unlawful and in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

I.      All damages which Named Plaintiffs and all FLSA Plaintiffs have sustained as a result of Defendant's conduct, including back pay, liquidated damages, general and special damages for lost compensation and job benefits they would have received but for Defendant's improper practices;

J.      An award to Named Plaintiffs and all FLSA Plaintiffs of pre-judgment interest at the highest level rate on all unpaid wages from the date such wages were earned and due;

K.      An award to Named Plaintiffs and all FLSA Plaintiffs representing Defendant's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes;

L.      An award to Named Plaintiffs and all FLSA Plaintiffs for the amount of unpaid wages, including interest thereon, and penalties, including liquidated damages subject to proof;

M.      Awarding Named Plaintiffs and all FLSA Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

N.      Pre-judgment and post-judgment interest, as provided by law; and

O.      Granting Named Plaintiffs and all FLSA Plaintiffs other and further relief as this Court finds necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Named Plaintiffs demand a trial by jury on all questions of fact raised by this complaint.

Dated:  November 9, 2018
        Garden City, New York

                                    Respectfully submitted,


                                    */s/ James Vagnini*
                                    James Vagnini, Esq.
                                    Robert J. Valli, Jr., Esq.

Sara Wyn Kane, Esq.
Matthew L. Berman, Esq.
**Valli Kane & Vagnini LLP**
600 Old Country Road, Suite 519
Garden City, New York 11530
(516) 203-7180 (phone)
(516) 706-0248 (fax)

**ATTORNEYS FOR PLAINTIFFS**